JUDGE TORRES

15 CV 03719

Joseph G. Sansone
Deputy Chief, Market Abuse Unit
Daniel M. Hawke*
G. Jeffrey Boujoukos*
David L. Axelrod*
Kelly L. Gibson*
Catherine E. Pappas*
David W. Snyder*
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY  10281
(212) 336-0517 (Sansone)
*Not admitted in the U.S. District Court for the Southern District of New York

RECEIVED

MAY 1 4 2015

U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>SEAN R. STEWART and ROBERT K. STEWART,<br><br>Defendants. | 15-CV-____ (___)<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against Defendants Sean R. Stewart ("S. Stewart") and Robert K. Stewart ("R. Stewart"), and alleges as follows:

## SUMMARY

1.    This matter involves an unlawful, serial insider trading scheme orchestrated by three financial industry professionals, in which S. Stewart tipped material non-public information

to his father, R. Stewart, in breach of a duty he owed to his investment bank employers and/or the shareholders of the companies these banks advised. In an effort to conceal his trading, R. Stewart partnered with a friend (identified here as Trader1) to exploit this information by placing highly profitable securities trades.

2.      As an investment banker at two prominent investment banks, S. Stewart learned non-public information about future mergers and acquisitions involving clients of these investment banks. From 2010 to 2014, on at least six occasions, S. Stewart tipped his father R. Stewart about imminent mergers or acquisitions so that his father could benefit from this valuable information. R. Stewart used this information to place trades in his own account and in accounts owned by Trader1 to generate approximately $1.1 million in illicit proceeds over a four-year period.

3.      Both S. Stewart and R. Stewart took steps to avoid detection. In 2011, in response to a regulatory investigation into potential insider trading, S. Stewart lied to his investment bank employer. And R. Stewart knew that because of his undeniable relationship with his son, he needed to recruit a partner who would trade in his stead to conceal his trading activity. To this end, R. Stewart approached Trader1 and the two men agreed that Trader1 would trade in his account and then split the illicit profits with R. Stewart.

4.      Additionally, R. Stewart and Trader1 attempted to conceal their illegal trading and evade detection by: (a) primarily meeting in-person to discuss the scheme; (b) using coded email messages to discuss the scheme; (c) spreading trades over numerous stock options series in an attempt to avoid regulatory scrutiny; (d) buying stock options during periods when these securities were more heavily traded in order to blend into the daily volume; (e) refraining from

options trading too close to the expected announcement date of a merger or acquisition; and (f) in most instances, sharing the illicit profits through cash payments.

5.     By this Complaint, the Commission now charges defendants S. Stewart and R. Stewart with illegal insider trading in violation of the federal securities laws.  By knowingly or recklessly engaging in the conduct described in this Complaint, defendants violated and, unless restrained and enjoined by the Court, will continue to violate Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78n(e)], and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.143-3].

## JURISDICTION AND VENUE

6.     The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§78u(d) and 78u-1], to enjoin such acts, practices, and courses of business; and to obtain disgorgement, prejudgment interest, civil money penalties and such other and further relief as the Court may deem just and appropriate.

7.     This Court has jurisdiction over this action pursuant to Sections 21(d) and (e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and (e), 78u-1 and 78aa].

8.     Venue in this District is proper because the defendants are found, inhabit, and/or transact business in the Southern District of New York and because one or more acts or transactions constituting the violations occurred in the Southern District of New York.

9.     In connection with the conduct alleged in this Complaint, defendants made use of a means or instrumentality of interstate commerce, of the mails, or of a facility of any national securities exchange.

## COMMONLY-USED TRADING TERMS

10.     A stock option, commonly referred to as an "option," gives its purchaser-holder the option to buy or sell shares of an underlying stock at a specified price (the "strike" price) prior to the expiration date.  Options are generally sold in "contracts," which give the option holder the opportunity to buy or sell 100 shares of an underlying stock.

11.     A "call" option gives the purchaser-holder of the option the right, but not the obligation, to purchase a security at a specified strike price within a specific time period. Generally, the buyer of a call option anticipates that the price of the underlying security will increase during a specified amount of time.

## DEFENDANTS

12.     **Sean R. Stewart**, age 34, resides in New York, NY.  S. Stewart currently is a managing director at Investment Bank #2, where he has worked since October 17, 2011.  From July 2006 until October 12, 2011, S. Stewart worked at Investment Bank #1, most recently as a vice president.

13.     **Robert K. Stewart**, age 60, resides in North Merrick, NY.  R. Stewart is a CPA licensed in the state of New York and a founder of a CPA firm located in New York, NY.  R. Stewart is also the CFO of a publicly-traded company that markets and sells products and mobile applications in the mobile-connection space.  R. Stewart has been the CFO for other companies as well.  R. Stewart is S. Stewart's father.  R. Stewart and S. Stewart have a close personal relationship.  From time to time, R. Stewart gave gifts to S. Stewart and provided him with other financial support, including helping S. Stewart pay for his June 2011 wedding.

## RELATED PERSONS AND ENTITIES

14.     Trader1 has spent almost his entire career in the securities industry and has held Series 7, 24, and 63 licenses.  While working at a real estate and property development company, Trader1 became close friends with R. Stewart.

15.     Dionex Corp. ("**Dionex**") is a manufacturer of analytical instruments and related accessories incorporated in Delaware with its principal place of business in Sunnyvale, CA.  At all relevant times its shares were publicly traded on the NASDAQ under the symbol "DNEX."

16.     Kendle International, Inc. ("**Kendle**") is a clinical research organization incorporated in Ohio with its principal place of business in Cleveland, OH.  At all relevant times its shares were publicly traded on the NASDAQ under the symbol "KNDL."

17.     Kinetic Concepts, Inc. ("**Kinetic**") is a maker of wound-care products and hospital beds incorporated in Texas with its principal place of business in San Antonio, TX.  At all relevant times Kinetic was traded on the New York Stock Exchange under the symbol "KCI."

18.     Gen-Probe, Inc. ("**Gen-Probe**") is a molecular diagnostics products and services company incorporated in Delaware with its principal place of business in San Diego, CA.  At all relevant times Gen-Probe was traded on the NASDAQ under the symbol "GPRO."

19.     Lincare Holdings, Inc. ("**Lincare**") is a home respiratory healthcare company incorporated in Delaware with its principal place of business in Clearwater, FL.  At all relevant times Lincare was traded on the NASDAQ under the symbol "LNCR."

20.     CareFusion Corp. ("**CareFusion**") is a medical technology company incorporated in Delaware with its principal place of business in San Diego, CA.  At all relevant times CareFusion was traded on the New York Stock Exchange under the symbol "CFN."

21.     **Investment Bank #1** is a Delaware limited liability company that maintains an office in New York, NY.  It is a registered broker-dealer pursuant to Section 15(b) of the Exchange Act.  Investment Bank #1 was a financial adviser on transactions described below involving: (a) Dionex; (b) Kendle; and (c) Kinetic.  S. Stewart was employed at Investment Bank #1 at the time that each of these transactions took place and remained employed there until approximately October 12, 2011.

22.     **Investment Bank #2** is a Delaware limited partnership that maintains an office in New York, NY.  It is a registered broker-dealer pursuant to Section 15(b) of the Exchange Act.  Investment Bank #2 was a financial adviser on transactions described below involving: (a) Gen-Probe; (b) Lincare; and (c) CareFusion.  S. Stewart is currently employed at Investment Bank #2 and worked there at the time each of these transactions took place.

## THE INSIDER TRADING SCHEME

23.     S. Stewart worked as an investment banker for Investment Bank #1 from July 2006 to October 12, 2011.  From October 17, 2011 to the present, S. Stewart has worked as an investment banker at Investment Bank #2.  As an investment banker at these firms, S. Stewart learned material non-public information about the firms' clients and potential mergers and/or acquisitions the firms' clients were contemplating.

24.     On at least six different occasions, S. Stewart tipped his father R. Stewart material non-public information about impending mergers and/or acquisitions so that his father could profitably invest in the companies that were about to be acquired.  In tipping this information to his father, S. Stewart repeatedly breached the duty of trust and confidence he owed to his employer.  On at least three of these occasions, S. Stewart was working for the company that was the target of the acquisition.  In these instances, he also breached a duty that he owed to the shareholders of those companies.

25.     On at least two occasions, R. Stewart used his son's tips to trade in his own account. Later, to conceal his trading, R. Stewart solicited a friend, Trader1, to purchase options in companies that S. Stewart advised him were about to be acquired. All told, R. Stewart and Trader1 made more than $1.1 million in illicit proceeds trading on the material non-public information S. Stewart obtained through his work at Investment Bank #1 and Investment Bank #2.

**A.      The Dionex Tender Offer Tip**

26.     On or about October 12, 2010, Thermo Fisher engaged Investment Bank #1 to advise it in connection with the potential acquisition of Dionex. On or about October 14, 2010, Thermo Fisher delivered a letter to Dionex stating that it was interested in acquiring Dionex at a cash price of $106.50 per share.

27.     Throughout October and November 2010, Thermo Fisher and Dionex continued to discuss a potential transaction. On November 29, 2010, the companies entered into a confidentiality agreement and commenced due diligence. At this point, Thermo Fisher had offered to acquire Dionex at $118.50 per share.

28.     Although Investment Bank #1 did not assign S. Stewart to work on Thermo Fisher's tender offer to Dionex, on or before November 30, 2010, S. Stewart learned about Thermo Fisher's potential acquisition of Dionex from a colleague who was assigned to work on the Dionex tender offer. Prior to December 9, 2010, S. Stewart tipped his father, R. Stewart, that Dionex was likely to be acquired.

29.     On December 7, 2010, S. Stewart called a cell phone used by R. Stewart three times, including one call that lasted approximately six minutes. On December 8, 2010, S. Stewart called his father's home telephone number at 7:09 p.m. and 7:11 p.m.

30.     The very next day, on December 9, 2010 at 3:45 p.m., R. Stewart bought 200 shares of Dionex stock for $96.96 per share, or a total of approximately $19,597, in a brokerage account he opened that day.  R. Stewart deposited $20,000 into this newly-opened account and used almost all of that money to purchase the Dionex shares.

31.     On December 13, 2010, Thermo Fisher publicly announced that it had entered into an agreement to buy Dionex for $118.50 per share, through a tender offer.  That day, Dionex's stock price closed at $117.83 per share, an increase of $19.66 per share, or approximately 20%, over the prior trading day's closing price of $98.17 per share.  In addition, Dionex's trading volume increased by over 3,446%, from 54,423 shares on the trading day prior to the announcement to 1.93 million shares on December 13.

32.     On December 13, 2010, the day the Dionex tender offer was made public, R. Stewart sold his 200 shares of Dionex stock for $118.12 per share, realizing a four-day profit of approximately $3,676.

**B.     The Kendle Transaction Tip**

33.     On December 20, 2010, Kendle asked Investment Bank #1 to advise the company on strategic alternatives including a potential sale or privatization of the company.  That same day, Investment Bank #1 assigned S. Stewart to work on the Kendle transaction.

34.     On January 21, 2011, S. Stewart emailed a colleague at Investment Bank #1 stating that the firm was "just officially mandated to sell Kendle" and that Investment Bank #1 planned to call thirteen firms about a possible transaction.  Prior to February 7, 2011, S. Stewart tipped his father, R. Stewart, that Kendle was likely to be acquired.

35.     On February 5, 2011, R. Stewart and S. Stewart exchanged at least eight telephone calls and three text messages.

36.     On February 7, 2011, R. Stewart bought 475 shares of Kendle stock at $11.52 per share, for approximately $5,636, and on February 22, 2011, he bought 1,550 shares of Kendle stock at $12.54 per share, for approximately $19,814.

37.     On March 2, 2011, S. Stewart emailed two colleagues, asking, "Can you tell me how kndl stock has done in after hours?"

38.     On March 3, 2011, S. Stewart and R. Stewart met in person.  Later that day, at 9:09 p.m., R. Stewart emailed his broker directing him to sell R. Stewart's position in another stock (which he had purchased approximately two months earlier) and use those proceeds to buy Kendle stock.

39.     The next day, on March 4, 2011 at 9:33 a.m., R. Stewart bought 750 shares of Kendle stock for approximately $9.86 per share, for a total cost of approximately $7,629.

40.     On March 8, 2011 at 10:50 a.m., INC Research, LLC emailed to S. Stewart a letter stating that it was interested in acquiring Kendle at a price between $11 and $14 per share.

41.     Shortly thereafter, on March 8, 2011, between 11:24 a.m. and 11:52 a.m., S. Stewart and R. Stewart exchanged three telephone calls.

42.     After the close of the market on May 4, 2011, Kendle and INC Research jointly announced that INC Research would acquire Kendle in an all-cash transaction for $15.25 per share, or $232 million. The next day, Kendle's stock price closed at $14.98 per share, an increase of $5.48 per share, or approximately 58%, over the prior trading day's closing price of $9.50 per share.  In addition, Kendle's trading volume increased by over 3,918%, from 173,689 shares on the trading day prior to the announcement to 6.98 million shares on May 5.

43.    On May 5, 2011, the day after the public announcement of the Kendle transaction, R. Stewart sold his entire position in Kendle stock for $14.99 per share, realizing a profit of approximately $7,887.

44.    Shortly thereafter, R. Stewart told his friend and co-worker Trader1, that he had received advanced notice that Kendle was going to be acquired.

45.    In June 2011, R. Stewart paid approximately $10,000 towards S. Stewart's wedding expenses.

**C.    The Kinetic Transaction Tip: R. Stewart Recruits Trader1 to Participate in the Insider Trading Scheme**

46.    On March 29, 2011, Kinetic forwarded to Investment Bank #1 an unsolicited proposal letter from Apax Partners LLP ("Apax") offering to buy Kinetic's outstanding common stock for between $63 and $65 per share, and Investment Bank #1 began advising Kinetic about this transaction.

47.    Although S. Stewart did not personally begin to work on the Kinetic transaction until June 10, 2011, he learned material non-public information about this proposed transaction by at least late March 2011. At or around this time, S. Stewart helped coordinate assignments for some junior employees at Investment Bank #1. This position allowed S. Stewart to learn about potential acquisitions in which he was not directly involved. For example, on March 30, 2011, an Investment Bank #1 colleague who was working on the Kinetic transaction sent an email to S. Stewart stating: "[Investment Bank #1 analyst] will work on the Kinetic project."

48.    On April 3, 2011, S. Stewart emailed a different colleague, who was working on the Kinetic transaction and asked, "Kci alright?" The colleague replied, in part: "KCI is going ok. Working away."

49.     On April 23, 2011, S. Stewart emailed that same colleague saying: "Also fyi: I mentioned to [an individual] that [a managing director and a vice president working on the Kinetic transaction] were very pleased thus far for all of your work on KCI (I had spoken w/ both of them last week) and that you were doing a really good job."

50.     Prior to April 25, 2011, S. Stewart tipped his father, R. Stewart, that Kinetic was likely to be acquired.

51.     In or around April 2011, R. Stewart asked Trader1 to purchase Kinetic options for him in Trader1's brokerage account. R. Stewart told Trader1 that news concerning Kinetic would be announced soon. R. Stewart explained that he wanted Trader1 to purchase the securities because R. Stewart was "too close to the source."

52.     Shortly thereafter, Trader1 began purchasing Kinetic call options. Between April 25, 2011 and June 27, 2011, Trader1 purchased a total of 365 Kinetic call options spread out over five different options series. Specifically, Trader1 purchased the following Kinetic call options in his individual brokerage account:

| Kinetic Options Series | Date(s) Purchased | Quantity Purchased | Approx. Cost | Approx. Profit |
| --- | --- | --- | --- | --- |
| (1) Kinetic May $60 Call | 4/25/2011 | 20 | $625.28 | N/A |
| (2) Kinetic June $62.50 Call | 5/17/2011 - 5/24/2011 | 80 | $2,190.61 | N/A |
| (3) Kinetic July $60 Call | 6/3/2011 - 6/27/2011 | 40 | $2,250.30 | $30,508.76 |
| (4) Kinetic July $62.50 Call | 6/6/2011 | 50 | $1,297.89 | $27,153.67 |
| TOTAL | | 190 | $6,364.08 | $57,662.43 |

53.     Trader1 also purchased the following Kinetic options in his IRA brokerage account:

| Kinetic Options Series | Date(s) Purchased | Quantity Purchased | Approx. Cost | Approx. Profit |
| --- | --- | --- | --- | --- |
| (1) Kinetic May $60 Call | 4/25/2011 | 20 | $625.28 | N/A |

| | | | | |
|---|---|---|---|---|
| (2) Kinetic June $60 Call | 5/20/2011 | 5 | $488.80 | N/A |
| (3) Kinetic June $62.50 Call | 5/20/2011 - 5/24/2011 | 70 | $1,573.04 | N/A |
| (4) Kinetic July $60 Call | 6/3/2011 - 6/27/2011 | 30 | $1,592.72 | $22,974.07 |
| (5) Kinetic July $62.50 Call | 6/6/2011 | 50 | $1,297.89 | $27,153.67 |
| **TOTAL** | | **175** | **$5,577.73** | **$50,127.74** |

54.     On May 4, 2011, Apax increased its offer to acquire all of Kinetic's outstanding

common stock from $70 to $72 per share.  That same day, at 5:12 p.m., R. Stewart called S.

Stewart at Investment Bank #1 and father and son spoke for approximately two minutes.

55.     On July 13, 2011, Kinetic announced that Apax had agreed to acquire Kinetic for

$68.50 per share.  That day, Kinetic's stock price closed at $68.23 per share, an increase of $3.74

per share, or approximately 6%, over the prior trading day's closing price of $64.49 per share.  In

addition, Kinetic's trading volume increased by over 2,933%, from 1.2 million shares on the

trading day prior to the announcement to 36.4 million shares on July 13.

56.     The Kinetic May $60 call options, June $60 call options, and June $62.50 call

options that Trader1 purchased in his individual and IRA accounts had expired prior to the public

announcement of the Kinetic transaction.

57.     On July 14, 2011, Trader1 sold the remaining 170 Kinetic call options, realizing a

profit of approximately $107,790.

58.     Trader1 paid R. Stewart the profits associated with the Kinetic options trades that

Trader1 had executed on R. Stewart's behalf.

59.     In or about July 2011, after Kinetic announced it was being acquired, Trader1

told R. Stewart that he had noticed that both times R. Stewart said he had information about a

stock, the company ended up being acquired.  R. Stewart told Trader1 that the information was coming from his son.

60.     Later, in or around the spring/summer of 2012, R. Stewart told Trader1 that S. Stewart had provided the information about the stocks they purchased, and that S. Stewart worked on Wall Street on the "sell side."

**D.     R. Stewart and Trader1 Agree to Trade on Inside Information Using Trader1's Brokerage Account**

61.     After the Kinetic transaction but before the Gen-Probe transaction, discussed below, R. Stewart and Trader1 agreed that they would use the material nonpublic information that R. Stewart obtained to execute trades in Trader1's individual brokerage account, and split the illicit profits.  At some point, Trader1 told R. Stewart he was placing similar trades in his IRA account for himself.

62.     To conceal their arrangement, Trader1 paid R. Stewart his share of the illicit profits through numerous in-person cash payments over an extended period of time.

63.     In addition, R. Stewart and Trader1 took a variety of other steps to prevent their illegal insider trading scheme from being discovered.  For example, when discussing trades, R. Stewart and Trader1 primarily met in person.  Occasionally, they discussed the scheme on the phone or in coded email messages, often using "golf" references to discuss aspects of the scheme.

64.     R. Stewart and Trader1 also employed several trading strategies to disguise the fact that they were trading on material non-public information.  For example, Trader1 spread his trades over numerous options series to avoid raising suspicion by placing a large bet in one particular series.  Trader1 further attempted to avoid detection by refraining from buying options too close to the expected announcement date.

E.    **The Kendle Transaction Inquiry**

65.    On or about May 20, 2011, Investment Bank #1 received an inquiry from a regulator in connection with the Kendle transaction. On July 19, 2011, the regulator sent Investment Bank #1 a list of individuals and entities it identified as trading Kendle stock in the period leading up to the announcement of the Kendle transaction. The regulator asked Investment Bank #1 to circulate the list among the individuals who worked on the transaction and ask them to identify anyone with whom they had a relationship. This list included the name "Robert Stewart" and identified the town and state in which he lived.

66.    Investment Bank #1 asked S. Stewart to identify anyone on the list with whom he had a relationship. S. Stewart did not identify his father, "Robert Stewart." On August 23, 2011, Investment Bank #1 submitted its response to the regulator, indicating that no one at Investment Bank #1 knew "Robert Stewart."

67.    On August 26, 2011, the regulator asked Investment Bank #1 to confirm that S. Stewart had reviewed the list and that Investment Bank #1's response included S. Stewart's response. Investment Bank #1 confirmed that S. Stewart's response was included.

68.    Between August 26, 2011 and August 31, 2011, Investment Bank #1 interviewed S. Stewart about the regulator's inquiry. On August 31, 2011, Investment Bank #1 submitted a supplemental response to the regulator in which it stated that during a second review, S. Stewart had identified his father, R. Stewart. Investment Bank #1's supplemental response stated that:

(a)    S. Stewart "overlooked" his father's name during the initial review and that S. Stewart now indicated that he recognized his father's name;

(b)    S. Stewart said that he did not discuss the Kendle transaction with his father; and

(c)     S. Stewart did not know of any circumstances under which his father
would have gained any knowledge of Kendle's business activities.

69.     On October 12, 2011, S. Stewart ceased to work for Investment Bank #1.  On
October 17, 2011, S. Stewart began working at Investment Bank #2.

## F.    The Gen-Probe Transaction Tip

70.     On March 7, 2012, Hologic engaged Investment Bank #2 to advise it on a
potential acquisition of Gen-Probe at a price of $80 to $85 per share.  That same day, Investment
Bank #2 assigned S. Stewart to work on the Gen-Probe transaction.  Upon being assigned to
work on this engagement, S. Stewart learned material non-public information about the
transaction, including the anticipated (per share) purchase price and the identity of the
participants in the transaction.

71.     Prior to April 19, 2012, S. Stewart tipped his father, R. Stewart, that Gen-Probe
was likely to be acquired.  Subsequently, R. Stewart relayed this tip to Trader1.

72.     As with the Kinetic transaction, R. Stewart asked Trader1 to purchase Gen-Probe
options in Trader1's account for R. Stewart.  Pursuant to the agreement discussed above, Trader1
agreed to purchase the options using his own funds and split the profits with R. Stewart.

73.     On the morning of April 18, 2012, R. Stewart and Trader1 had a two-minute
telephone call.  The next day, April 19, 2012, Trader1 began to purchase Gen-Probe call options.
Between April 19 and April 27, 2012, Trader1 purchased at total of 320 Gen-Probe call options
spread out over seven different options series.  Specifically, Trader1 purchased the following
Gen-Probe call options in his individual brokerage account:

| Gen-Probe Options Series | Date(s) Purchased | Quantity Purchased | Approx. Cost | Approx. Profit |
| --- | --- | --- | --- | --- |
| (1) GPRO May $80 Call | 4/27/2012 | 20 | $225.15 | $2,949.62 |
| (2) GPRO June $70 Call | 4/26/2012 | 10 | $2,217.57 | $9,064.57 |

| | | | | |
|---|---|---|---|---|
| (3) GPRO June $75 Call | 4/26/2012 - 4/27/2012 | 40 | $2,650.30 | $22,908.81 |
| (4) GPRO June $80 Call | 4/27/2012 | 30 | $632.73 | $4,734.41 |
| (5) GPRO Aug. $75 Call | 4/19/2012 - 4/24/2012 | 40 | $5,250.30 | $21,728.71 |
| **TOTAL** | | **140** | **$10,976.05** | **$61,386.12** |

74. Trader1 purchased the following Gen-Probe call options in his IRA account:

| Gen-Probe Options Series | Date(s) Purchased | Quantity Purchased | Approx. Cost | Approx. Profit |
|---|---|---|---|---|
| (1) GPRO May $70 Call | 4/23/2012 | 20 | $2,525.15 | $20,449.18 |
| (2) GPRO May $75 Call | 4/23/2012 | 40 | $1,190.31 | $24,358.78 |
| (3) GPRO June $70 Call | 4/26/2012 | 30 | $6,532.73 | $27,333.77 |
| (4) GPRO June $75 Call | 4/27/2012 | 30 | $2,132.73 | $16,534.11 |
| (5) GPRO Aug. $75 Call | 4/24/2012 | 60 | $8,905.47 | $30,528.16 |
| **TOTAL** | | **180** | **$21,286.39** | **$119,204.00** |

75. Trader1 purchased more Gen-Probe options as the deal progressed towards completion. For example, on April 21, 2012, Gen-Probe circulated a draft merger agreement with Hologic and its advisers. That same day, at 11:47 a.m., S. Stewart called R. Stewart's cell phone and the men spoke for approximately six minutes. Approximately two hours later, between 1:43 p.m. and 1:54 p.m., Trader1 entered orders to buy 80 Gen-Probe August $75 call options and 40 Gen-Probe May $75 call options in his individual and IRA brokerage accounts.

76. On April 30, 2012, Gen-Probe and Hologic announced that Hologic had agreed to acquire Gen-Probe for $82.75 per share, or $3.72 billion. That day, Gen-Probe's stock price closed at $81.55 per share, an increase of $12.84 per share, or approximately 19%, over the prior trading day's closing price of $68.72 per share. In addition, Gen-Probe's trading volume increased by over 5,234% from 355,399 shares on the trading day prior to the announcement to 18.96 million shares on April 30, 2012.

77.   Between May 2 and May 10, 2012, Trader1 sold the 320 Gen-Probe options that he had acquired in his individual and IRA accounts, realizing a total profit of approximately $180,590.

78.   Trader1 paid R. Stewart his share of the illicit Gen-Probe transaction profits principally in cash payments.

## G.   The Lincare Tender Offer Tip

79.   On May 24, 2012, the Linde Group, a German industrial gas company, contacted Investment Bank #2 to discuss the possibility of Investment Bank #2 advising Linde Group on a potential acquisition of Lincare.

80.   From this point forward, Investment Bank #2 advised the Linde Group on this acquisition.  Through his employment at Investment Bank #2, S. Stewart learned that the Linde Group was exploring an acquisition of Lincare.  Prior to May 27, 2012, S. Stewart tipped his father, R. Stewart, that Lincare was likely to be acquired.

81.   In May 2012, R. Stewart relayed this tip to Trader1.  On May 27, 2012, at 9:35 p.m., which was the Sunday of Memorial Day weekend, R. Stewart sent Trader1 a coded email stating, in part: "might have an opportunity to play golf- but would need to book the reservation as soon as the office opens Tuesday morning."

82.   Trader1 began purchasing Lincare options on the morning of Tuesday, May 29, 2012.  Between May 29 and June 28, 2012, Trader1 bought a total of 375 Lincare call options spread out over seven different options series.  Specifically, in his individual brokerage account, Trader1 bought the following Lincare call options:

| Lincare Options Series | Date(s) Purchased | Quantity Purchased | Approx. Cost | Approx. Profit |
|---|---|---|---|---|
| (1) LNCR June $24 Call | 5/29/2012 | 25 | $278.94 | N/A |
| (2) LNCR June $25 Call | 5/29/2012 | 25 | $278.94 | N/A |

| (3) LNCR July $24 Call | 5/29/2012 - 6/12/2012 | 30 | $1,792.72 | $50,073.36 |
| (4) LNCR July $25 Call | 5/29/2012 - 6/13/2012 | 45 | $1,389.08 | $71,915.14 |
| (5) LNCR July $26 Call | 6/21/2012 | 10 | $817.58 | $14,464.49 |
| (6) LNCR July $27 Call | 6/21/2012 | 20 | $925.16 | $27,849.03 |
| (7) LNCR July $35 Call | 6/28/2012 | 10 | $767.62 | $5,514.65 |
| **TOTAL** | | **165** | **$6,250.04** | **$169,816.67** |

83.    Trader1 also bought the following Lincare call options in his IRA account:

| Lincare Options Series | Date(s) Purchased | Quantity Purchased | Approx. Cost | Approx. Profit |
|---|---|---|---|---|
| (1) LNCR June $24 Call | 5/29/2012 | 25 | $528.94 | N/A |
| (2) LNCR June $25 Call | 5/29/2012 | 25 | $278.94 | N/A |
| (3) LNCR July $24 Call | 5/29/2012 - 6/12/2012 | 45 | $2,804.09 | $75,000.03 |
| (4) LNCR July $25 Call | 5/29/2012 - 6/12/2012 | 45 | $1,479.09 | $72,275.12 |
| (5) LNCR July $26 Call | 6/21/2012 | 20 | $1,625.16 | $28,948.99 |
| (6) LNCR July $27 Call | 6/21/2012 | 40 | $1,640.34 | $55,918.02 |
| (7) LNCR July $35 Call | 6/28/2012 | 10 | $767.62 | $5,614.65 |
| **TOTAL** | | **210** | **$9,124.18** | **$237,756.81** |

84.    Prior to the public announcement that the Linde Group was purchasing Lincare through a tender offer, between June 14 and June 15, 2012 Trader1 sold the 50 Lincare June $24 call options and the 50 Lincare June $25 call options for a profit of approximately $5,574, and $589, respectively.

85.    Between May 23 and May 29, 2012, Linde Group and Lincare, negotiated the terms of an amended confidentiality agreement, and on May 29, 2012, they executed the amended confidentiality agreement. From May 29, 2012 until the announcement of the merger agreement on July 1, the Linde Group conducted due diligence on Lincare.

86.    On June 27, 2012, the Financial Times reported that Linde Group might acquire Lincare. Later that day, Trader1 spoke to R. Stewart on the telephone for thirteen minutes, and

shortly thereafter R. Stewart and Trader1 exchanged two more phone calls. The following day, June 28, 2012, Trader1 bought 20 Lincare July $35 call options.

87.     On July 1, 2012, after the close of regular market trading, the Linde Group announced that it had agreed to acquire Lincare for $41.50 per share, or $3.8 billion, through a tender offer. On July 2, 2012, the first trading day after the public announcement, Lincare's stock price closed at $41.34 per share, an increase of $7.32 per share, or approximately 22%, over the prior trading day's closing price of $34.02 per share. In addition, Lincare's trading volume increased by over 851%, from 8.9 million shares on the trading day prior to the announcement to 84.65 million shares on July 2.

88.     On July 6, 2012, Trader1 sold his remaining 275 Lincare call options, realizing a profit of approximately $407,573. Approximately sixteen minutes after Trader1 sold the last of the Lincare call options, he sent an email to R. Stewart saying, "I ment [sic] to tell you and your wife to have a celebration drink on me! I have some good news for you when you get back." A few minutes later, R. Stewart replied using the same golf-related code he had used in his email of May 27, 2012. R. Stewart stated: "Thanks [Trader1]- saw local story about high cost of golf reservations since a foreign company purchased all- even more expensive than imagined."

89.     Like the Kinetic and Gen-Probe transactions, Trader1 paid R. Stewart his share of the illicit profits from the Lincare tender offer tip, with incremental cash payments slowly over time and through a few checks.

90.     In or about December 2012, R. Stewart transferred at least $10,000 to his son, S. Stewart.

H.    **The CareFusion Transaction Tip**

91.    On March 7, 2014, healthcare company Becton Dickinson contacted CareFusion and indicated that it was interested in acquiring CareFusion. On April 23, 2014, Investment Bank #2 signed an engagement letter to advise CareFusion in connection with the potential CareFusion transaction.

92.    On March 7, 2014, S. Stewart was assigned to work on the CareFusion transaction. Upon being assigned to work on this engagement, S. Stewart learned material non-public information about the transaction, including the anticipated (per share) purchase price and the identity of the participants in the transaction. Prior to August 19, 2014, S. Stewart tipped his father, R. Stewart, that CareFusion was likely to be acquired.

93.    On August 1, 2014, Becton Dickinson submitted a written, non-binding, preliminary indication of interest in potentially acquiring CareFusion at a price range of $53 to $55 per share.

94.    On Sunday, August 17, 2014, R. Stewart and Trader1 exchanged emails to arrange an in-person meeting.

95.    On August 18, 2014, CareFusion and Becton Dickinson entered into a mutual non-disclosure and standstill provision. That same day, Becton Dickinson began due diligence.

96.    On August 18, 2014, Trader1 emailed R. Stewart stating: "I will be in the city tomorrow, probably late morning. I'll touch base with you in the morning." R. Stewart replied, "Thanks- let me know and we can meet up quickly."

97.    On August 19, 2014 at approximately 2:00 p.m., Trader1 met R. Stewart in Midtown Manhattan. At or around the time of this meeting, R. Stewart tipped Trader1 regarding the potential acquisition of CareFusion.

98.     Later that same day, at approximately 3:53 p.m., Trader1 began buying

CareFusion call options.  Between August 19 and October 2, 2014, Trader1 bought a total of 630

CareFusion call options spread out over eleven different options series.  Specifically, in two

individual brokerage accounts, Trader1 bought the following CareFusion call options:

| CareFusion Options Series | Date(s) Purchased | Quantity Purchased | Approx. Cost | Approx. Profit |
|---|---|---|---|---|
| (1) CFN Sept. $46 Call | 8/21/2014 | 10 | $567.66 | N/A |
| (2) CFN Oct. $46 Call | 9/16/2014 - 9/25/2014 | 55 | $5,517.31 | $56,669.12 |
| (3) CFN Oct. $47 Call | 8/21/2014 - 9/22/2014 | 40 | $2,926.72 | $38,631.70 |
| (4) CFN Oct. $48 Call | 9/12/2014 - 9/16/2014 | 40 | $2,360.71 | $35,287.73 |
| (5) CFN Oct. $49 Call | 8/29/2014 - 9/3/2014 | 60 | $2,456.04 | N/A |
| (6) CFN Nov. $45 Call | 10/2/2014 | 5 | $813.82 | $5,472.22 |
| (7) CFN Nov. $46 Call | 9/25/2014 - 10/2/2014 | 35 | $5,273.82 | $35,288.46 |
| (8) CFN Nov. $47 Call | 9/22/2014 | 10 | $1,467.66 | $9,114.40 |
| (9) CFN Dec. $48 Call | 9/12/2014 - 9/15/2014 | 25 | $3,589.18 | $20,321.07 |
| (10) CFN Dec. $49 Call | 8/25/2014 - 8/28/2014 | 20 | $1,835.40 | $15,338.89 |
| (11) CFN Dec. $50 Call | 9/2/2014 - 9/3/2014 | 30 | $2,693.02 | $20,073.48 |
| TOTAL | | 330 | $29,501.34 | $236,197.07 |

99.     Trader1 bought the following CareFusion call options in his IRA account:

| CareFusion Options Series | Date(s) Purchased | Quantity Purchased | Approx. Cost | Approx. Profit |
|---|---|---|---|---|
| (1) CFN Sept. $46 Call | 8/21/2014 | 10 | $567.66 | N/A |
| (2) CFN Oct. $46 Call | 9/16/2014 - 9/25/2014 | 50 | $5,108.35 | $51,232.08 |
| (3) CFN Oct. $47 Call | 8/21/2014 - 9/22/2014 | 40 | $2,910.68 | $38,647.68 |
| (4) CFN Oct. $48 Call | 9/12/2014 - 9/16/2014 | 30 | $1,743.11 | $26,423.22 |
| (5) CFN Oct. $49 Call | 8/29/2014 - 9/3/2014 | 60 | $2,476.17 | N/A |
| (6) CFN Nov. $45 Call | 10/2/2014 | 5 | $813.85 | $5,472.18 |

| | | | | |
|---|---|---|---|---|
| (7) CFN Nov. $46 Call | 9/25/2014 - 10/2/2014 | 35 | $5,296.98 | $35,265.14 |
| (8) CFN Nov. $47 Call | 9/22/2014 | 10 | $1,467.66 | $9,114.44 |
| (9) CFN Dec. $48 Call | 8/19/2014 | 10 | $1,167.66 | $8,314.47 |
| (10) CFN Dec. $49 Call | 8/25/2014 - 8/28/2014 | 20 | $1,895.32 | $15,278.94 |
| (11) CFN Dec. $50 Call | 9/2/2014 - 9/3/2014 | 30 | $2,692.98 | $20,073.52 |
| **TOTAL** | | **300** | **$26,140.42** | **$209,821.67** |

100.    Prior to the public announcement of the CareFusion transaction, Trader1 sold the 20 CareFusion Sept. $46 call options and the 120 CareFusion October $49 call options for a small profit of $429 and a small loss of approximately $4,144, respectively.

101.    On Sunday, October 5, 2014, Becton Dickinson announced that it had agreed to acquire CareFusion for $58 per share in cash and stock.  On Monday, October 6, 2014, the first trading day after the public announcement, CareFusion's stock price closed at $56.75 per share, an increase of $10.58 per share, or approximately 23%, over the prior trading day's closing price of $46.17 per share.  In addition, CareFusion's trading volume increased by over 4,261%, from 1.16 million shares on the trading day prior to the announcement to 50.59 million shares on October 6.

102.    The night before the CareFusion transaction was publicly announced R. Stewart took S. Stewart to dinner at a high-end seafood restaurant in Manhattan.  The next day, at 9:20 p.m., S. Stewart emailed R. Stewart a copy of an article announcing the CareFusion transaction. R. Stewart replied congratulating S. Stewart, who responded: "Thanks a lot – thanks for dinner last night; nice to see everyone."

103.    Between October 7 and October 9, 2014, Trader1 sold the remaining 490 CareFusion call options, realizing a profit of approximately $446,018.

104.   On March 24, 2015, Trader1 paid R. Stewart $2,500 of the CareFusion profits he owed him at a meeting in a Manhattan diner.  During this meeting, R. Stewart told Trader1 that he believed his phones were tapped and that S. Stewart had once told R. Stewart that he had given him a tip on a "silver platter" that R. Stewart failed to exploit.

## S. STEWART AND R. STEWART VIOLATED THE FEDERAL SECURITIES LAWS

105.   As detailed above, on multiple occasions S. Stewart tipped R. Stewart material non-public information that R. Stewart used to trade in his own account and through Trader1.  A reasonable investor would have viewed the inside information, and each component thereof, as being important to his or her investment decision.

**A.    S. Stewart Breached His Duty to Investment Bank #1 and Investment Bank #2 and the Duty He owed the Shareholders of his Employers' Clients**

106.   Kendle and Kinetic were clients of Investment Bank #1 and CareFusion was a client of Investment Bank #2 when S. Stewart disclosed information about these companies to his father, R. Stewart.  Because S. Stewart was employed by an investment bank advising these companies, he owed a fiduciary or other duty of trust and confidence to the shareholders of Kendle, Kinetic, and CareFusion, respectively.  As a result of this relationship, S. Stewart had a duty to abstain from trading on the material non-public information he obtained regarding Kendle, Kinetic, and CareFusion, or from giving such information to an outsider (such as his father) for the same improper purpose of exploiting the information for personal gain.  In breach of this duty, and for the personal benefit of giving his father profitable information to trade on, S. Stewart tipped material non-public information to his father, R. Stewart, knowingly or recklessly disregarding that R. Stewart reasonably could be expected to trade on the basis of that information and/or tip the information to someone else who reasonably could be expected to

trade on the basis of that information. And even if he was not properly considered a "corporate insider" for purposes of the Kendle, Kinetic, and CareFusion transactions, S. Stewart owed a duty of trust and confidence to his respective employer on these deals, as discussed below. Accordingly, S. Stewart also breached the duties he owed to his employers by misappropriating material non-public information concerning the acquisitions of Kendle, Kinetic, and Carefusion and tipping that information to his father, R. Stewart.

107.    With respect to the Dionex tender offer, S. Stewart owed a duty of trust and confidence to his employer, Investment Bank #1. S. Stewart knew or should have known that the information he possessed through his employment at Investment Bank #1 regarding the Dionex tender offer, as well as the information he possessed regarding all of the other transactions at issue in this complaint advised by his employer, Investment Bank #1, was confidential and that he had a duty not to misappropriate this information by using it to trade or passing the information to an outsider (such as his father) for the same improper purpose of exploiting the information for personal gain.

108.    Investment Bank #1's Code of Conduct at the time of S. Stewart's employment, prohibited employees, with limited exception, from disclosing "confidential information" about a firm's "advisory clients." Moreover this Code of Conduct expressly prohibited the communication of inside information to others: "Buying or selling securities while in possession of material nonpublic information is prohibited, as is the communication of that information to others." The Code of Conduct further stated that an employee "may not pass along any inside information expressly or by way of making a recommendation for the purchase or sale of such securities based upon inside information." The Code of Conduct defined "inside information" to

include "material, nonpublic information about the securities, activities, or financial condition of a corporation, public entity, or other issuer of securities."

109.    With respect to the Gen-Probe transaction and the Lincare tender offer, S. Stewart owed a duty of trust and confidence to this employer, Investment Bank #2, and had a duty not to disclose or trade on this information.  S. Stewart knew or should have known that the information he possessed through his employment at Investment Bank #2 regarding the Gen-Probe transaction and the Lincare tender offer, as well as the information he possessed regarding the CareFusion transaction, was confidential and that he had a duty not to misappropriate this information by using it to trade or passing the information to an outsider (such as his father) for the same improper purpose of exploiting the information for personal gain.

110.    Investment Bank #2's "Global Policies on Use of Confidential Information," obligated  employees "to maintain the confidentiality of all Confidential Information" and prohibited the disclosure of "Confidential Information to any person outside the Firm (including family members), except as required in the performance of the Firm's business activities." "Confidential Information" is defined as, "[i]nformation about the existence of, or the potential for, a client, client assignment, investor or investment" and includes information "from a client or its advisors in the course of an existing or potential advisory engagement in (i) mergers, acquisitions or divestitures" and "(ii) proposed tender offers for corporate control . . . ."

**B.      R. Stewart Unlawfully Traded and Tipped Trader1**

111.    R. Stewart knew or recklessly disregarded that the information tipped to him by S. Stewart was material and nonpublic.

112.    At all relevant times, R. Stewart knew or should have known that the material non-public information S. Stewart tipped him had been disclosed in breach of S. Stewart's

fiduciary duties or other duties of trust or confidence, or otherwise misappropriated, for the obvious benefit of providing it to his father.

113.    When S. Stewart tipped the material non-public information to his father, R. Stewart assumed his son's duties to keep the information confidential and to refrain from trading on it or tipping it to others.  R. Stewart knowingly breached these duties by:

      a.    trading on the basis of that information in connection with the Dionex tender offer and the Kendle transaction; and

      b.    tipping the material non-public information in connection with the Kinetic transaction, the Gen-Probe transaction, the Lincare tender offer, and the CareFusion transaction, to his friend, Trader1, expecting that Trader1 would trade on the basis of that information and split the profits from that trading.

114.    R. Stewart knew or recklessly disregarded that he was not permitted to trade on the basis of this material non-public information or tip this information to Trader1 expecting that Trader1 would trade on the information and split the profits with R. Stewart.

## CLAIMS FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

115.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-114 inclusive, as if they were fully set forth herein.

116.    The information S. Stewart passed to R. Stewart regarding all the transactions identified in this Complaint, and each component thereof, was material and nonpublic.

117.    At all times relevant to this Complaint, defendants acted knowingly or recklessly.

118.    By engaging in the conduct described above, defendants directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

> (a) employed devices, schemes or artifices to defraud;
>
> (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or
>
> (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

By reason of the foregoing, the Defendants violated and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

### Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder

119.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-118 inclusive, as if they were fully set forth herein.

120.    By December 9, 2010, the date of the first illegal trade in Dionex securities alleged herein, substantial steps to complete Thermo Fisher's tender offer to acquire Dionex had already been taken.  Specifically, the companies had retained financial advisers and legal counsel, executed a confidentiality agreement, were conducting due diligence, were negotiating the price of the transaction, and were in the process of negotiating and drafting a merger agreement.

121.    As of May 29, 2012, the date of the first illegal trade in Lincare securities alleged herein, substantial steps to complete the Linde Group's tender offer to acquire Lincare had already been taken.  Specifically, the companies had retained financial advisers and legal counsel, executed a confidentiality agreement, and had begun conducting due diligence.

122.    S. Stewart knew or had reason to know that the information regarding the Dionex tender offer was nonpublic information that had been acquired by Investment Bank #1, which was working on behalf of the offeror, Thermo Fisher.  Similarly, S. Stewart knew or had reason to know that the information regarding the Lincare tender offer was nonpublic information that had been acquired by Investment Bank #2, which was working on behalf of the issuer, Lincare. S. Stewart was required to refrain from communicating this information to third parties, including R. Stewart, under circumstances in which it was reasonably foreseeable that such communications were likely to result in unlawful trading.

123.    R. Stewart knew or had reason to know that the information S. Stewart tipped him regarding the Dionex tender offer was nonpublic information that had been acquired from someone working on behalf of the offeror or issuer.

124.    At the time R. Stewart traded in Dionex securities as described herein, he was in possession of material nonpublic information regarding the Dionex tender offer that he knew or had reason to know was nonpublic and acquired directly or indirectly from a someone working on behalf of the offeror or issuer.

125.    R. Stewart knew or had reason to know that the information regarding the Lincare tender offer was nonpublic information that had been acquired from someone working on behalf of the offeror or issuer.  R. Stewart was required to refrain from communicating this information

to third parties, including Trader1, under circumstances in which it was reasonably foreseeable that such communications were likely to result in unlawful trading.

126.    By reason of the foregoing, defendants violated, unless enjoined, will continue to violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

### I.

Permanently restraining and enjoining defendants S. Stewart and R. Stewart from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and from engaging in conduct in violation of Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14-e3];

### II.

Ordering each defendant to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, jointly and severally, together with prejudgment interest thereon;

### III.

Ordering each defendant to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

## IV.

Issue an order pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)],

barring R. Stewart from serving as an officer or director of any issuer that has a class of

securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C.

§ 78l], or that is required to file reports with the Commission pursuant to Section 15(d) of the

Exchange Act [15 U.S.C. § 78o(d)]; and

## V.

Grant such other and further relief as this Court may deem just, equitable, or necessary in

connection with the enforcement of the federal securities laws and for the protection of investors.

Dated:   New York, New York
       May 14, 2015

                                        Joseph G. Sansone

                                        U.S. Securities and Exchange Commission
                                        New York Regional Office
                                        Brookfield Place
                                        200 Vesey Street, Suite 400
                                        New York, NY 10281-1022
                                        (212) 336-0517 (Sansone)
                                        sansonej@sec.gov

Of Counsel:
Daniel M. Hawke*
G. Jeffrey Boujoukos*
David L. Axelrod*
Kelly L. Gibson*
Catherine E. Pappas*
David W. Snyder*

* Not admitted in the S.D.N.Y.